# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

| | | |
|---|---|---|
| KENNETH ROBINSON and CHRISTOPHER HALL, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| PRIORITY AUTOMOTIVE HUNTERSVILLE, INC.  d/b/a PRIORITY HONDA HUNTERSVILLE, | ) ) ) ) | Case No.: **3:20-cv-00318** |
| and | ) ) | |
| JAMES BECKLEY, | ) ) | |
| Defendants. | ) | |

## PRIORITY'S MEORANDUM OF LAW
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant Priority Automotive Huntersville, Inc. d/b/a Priority Honda Huntersville ("Defendant" or " Priority"), by counsel, pursuant to Federal Rule of Civil Procedure 56, submits this Memorandum of Law in Support of its Motion for Summary Judgment and requests that this Court dismiss Plaintiffs' Complaint with prejudice.

## I.    PRELIMINARY STATEMENT

The facts of this constructive discharge case span a mere five days in which a new General Manager ("GM"), James Beckley, was installed at Priority's dealership.  Plaintiffs incorrectly and unreasonably perceived the normal, non-discriminatory processes of new leadership coming on board, such as motivational talks, job coaching, floor plan optimization, and personnel evaluation as disrespectful and discriminatory.  Through discovery, Plaintiffs' allegations of egregious conduct, such as the dealership being segregated by race, completely fell apart, and Plaintiffs admitted in

1

depositions that their evidence of discrimination was speculative and often based on inferring racist intent in everyday statements simply because the speaker was white.

Beckley's first day was a Friday, and by Tuesday morning, both Plaintiffs submitted written complaints to human resources about their concerns.  Immediately, Priority investigated and asked to meet with Plaintiffs.  Both dismissed Priority's efforts and resigned.  No reasonable person would perceive the actions underlying Plaintiffs' claims as discriminatory, and Plaintiffs, as a matter of law, fail to prove their work environment was discriminatory, hostile, and/or so intolerable they had no choice but to resign.

## II.   STATEMENT OF UNDISPUTED FACTS[1]

In mid-July 2019, Priority hired Beckley as its new GM.  (DU Decl. ¶8).  Plaintiffs are African American and were sales managers at the time of Beckley's arrival.  (KR Tr. 63; CH Tr. 34).  It is strictly within the following five-day timeframe that Plaintiffs claim their work environment became so intolerable they had no reasonable choice but to resign.

### a.  DAY ONE: Friday, July 19, 2019

On Friday, July 19, 2019, Beckley arrived at 8:30am for his first day.  (KR Tr. 55; JB Tr. 19). Priority owner Matt Ellmer called an all-staff meeting and introduced Beckley.  (KR Tr. 58-59, 62; JB Tr. 50).  Ten people accompanied Beckley who he hoped to onboard.  (JB Tr. 43-50; DU Decl. ¶13). While Plaintiffs recognize it is common in the industry for new GMs to bring trusted employees with them, Plaintiffs immediately perceived the store "was separated by race" because he brought with him a "white crowd."  Plaintiffs admit, though, this "white crowd" included African Americans and many other non-white people.  (KR Tr. 71-73, 74-77; CH Tr. 30-34; 72-73; JB Tr. 43-50; KV Tr. 61-62).

---

[1] An Exhibit Index is attached as **Exhibit 1.**

Plaintiffs' own witness, Kyle Vasquez, called the notion the store was separated by race "silly." (KV Tr. 73).

The rest of the day was hectic, as one would expect during a change in control. (DU Decl. ¶¶13-16; CH Tr. 170; KV Tr. 64-65). Controller Diane Ulmer began working to onboard the new employees in the lobby, Beckley began cleaning up trash and working on a plan to restructure the dealership's physical layout and financial processes, and staff scrambled to help Beckley and Ulmer, while continuing to perform regular duties as sales and service customers arrived. (DU Decl. ¶¶13-16; CH Tr. 65-67; KV Tr. 66-69).

Despite the expected "chaos," Robinson felt he did not receive the respect he deserved, "I wasn't given the respect as a human being to even be[] introduced to my new boss on the day of his arrival." (KR Tr. 68-69, 110-112; CH Tr. 59, 170). Specifically, Robinson was upset Beckley did not immediately give him direction or shake his hand, and that he had not had an opportunity to speak with anyone about the changes that were occurring at the dealership that day. (KR Tr. 68-71). The dealership has about 90 employees (DU Decl. ¶18).

In addition to feeling disrespected, Plaintiffs claim staff of all races[2]—black, white, Hispanic—stopped approaching them to perform deals and took deals to a new sales area. (KR Tr. 71-82, 102-05; CH Tr. 59-64, 169-70). To increase efficiency, Beckley had changed the physical location of the sales desk to the sales lobby, which Plaintiffs admit is true. (KR Tr. 89-90; CH Tr. 58-66, 81-87; JB Tr. 69-72; 77-78, 96-97; KV Tr. 68-69). Plaintiffs chose to remain at their old desks—a good 90 feet away. (JB Tr. 69-72; 98-99; KV Tr. 68-69, 123, 126-128, 135; DU Decl. ¶¶16-17). Regardless, Plaintiffs argue this happened because of their race. (KR Tr. 75, 89-90; CH Tr. 58-66, 123). Plaintiffs

---

[2] Plaintiffs allege these staff included Wallah Richardson, Chris Hart, Lester McCoy, Gwen Mingus, Ralph Lamb, Dani Polli, Eric Crawford, Quinton Alston, Kyle Vasquez, Mike Gaston, and Robert Gathers. (KR Tr. 65-66; CH Tr. 59-64).

3

make this accusation even though other non-white and African American employees were using the new sales deal area.  (KR Tr. 74; KV Tr. 102-03).  Robinson called Ulmer that afternoon and reported his concerns.  (KR Tr. 68-71).

### b.  DAY TWO: Saturday, July 20, 2019

The next morning, Beckley held a sales meeting.  (KR Tr. 82).  Beckley read allowed a text message from a Honda representative stating something to the effect of, "Let's run 65 percent penetration and make Priority Honda great again."  (KR Tr. 82-89, 122-23; JB Tr. 50-51).  Plaintiffs explained they and the African American community perceived this "MAGA" statement as racist because it is associated with former President Donald Trump.  (KR Tr. 82-86, 122-23; CH Tr. 99-100, 177).

Plaintiffs also took issue with what they believed was a poor training technique when Beckley played a recording of sales manager, Robert Gathers, who is African American, on a customer call and explained to the sales team how to improve the call.  (KR Tr. 83-85, 208-09; CH Tr. 74-78).  Beckley had implemented this same technique at prior dealerships and listened to about 20 sales calls the night before from various sales employees before choosing a call he felt would best exemplify his training objective.  (JB Tr. 54-65).  Beckley never mentioned the employee's name and did not know who the employee was, or the employee's race, until after the meeting.  (JB Tr. 55, 64; KV Tr. 74-77).  Gathers himself recognized there was no intent to humiliate Gathers because of his race.  (RG Decl. ¶12).  Beckley also called out a non-African American employee at the sales meeting as part of his training exercise.  (KV Tr. 109-11).  Regardless, Robinson felt the use of the sales call was belittling, and speculated Beckley "would never do that to a white man."  (KR Tr. 85).  Hall likewise believed the decision was racially motivated, speculating, "I just think that, because of who he was, he picked the call."  (CH Tr. 74-78, 175-77).

4

Robinson also testified that Beckley "rearranged the whole dealership" in the middle of the night and his computer was moved along with other personal belongings like his cup and family pictures. (KR Tr. 89-90). Hall claims his keys, pictures, and some medicine was missing after the reorganization, but he never tried to locate his belongings. (CH Tr. 66-67). While Robinson recognized that a physical reorganization of the sales floor is common when a new GM comes onboard, Robinson believes Beckley's reorganization was again based on race because Robinson personally was not aware of the intended changes: "I don't think that no white man, like James Beckley is, would do that to another white man. He would give them the courtesy to explain to them that what was going on." (KR Tr. 96-97). Further, Plaintiffs admit the physical reorganization impacted all employees—not just Plaintiffs. (KR Tr. 89-95; CH Tr. 65-67; JB Tr. 69-95; DU Decl. ¶20; KV Tr. 66-69).

Plaintiffs confronted Beckley about their employment prospects later that morning. (KR Tr. 110-13; CH Tr. 63). "What is our job? What are we supposed to do?" asked Hall. (CH Tr. 63). Beckley told them to "do what [they have] been doing." (CH Tr. 63). Plaintiffs felt like Beckley brushed them off, told them he would get to it on Monday, and failed to clarify whether their pay would change or what their position would be under the new leadership. (KR Tr. 63-64, 110-13; CH Tr. 63-70). Robinson felt Beckley's word was not enough of a commitment and they should have been afforded formal written pay plans that moment. (KR Tr. 113). Plaintiffs perceived all employees except them received new pay plans when, in fact, only sales associates received pay plans—not any managers. (CH Tr. 70; JB Tr. 113-20; KV Tr. 115-17). Again it was only Beckley's second day; Beckley was still reviewing Priority's processes and determining where resources and personnel were needed, and also had to run management pay plans and many other plans by Ellmer. (JB Tr. 120).

5

### c. DAY THREE: Sunday, July 21, 2019

Plaintiffs did not work Sunday but changes did occur at the dealership, including the removal of a wall blocking the sales desks to increase the efficiency of the sales process. (KR Tr. 68, 101; CH. Tr. 100; JB Tr. 70-72).

### d. DAY FOUR: Monday, July 22, 2019

Robinson claimed "Monday, the same thing resumed…. You come to work to work. But you have no work provided to you. That doesn't work nowhere in this country." (KR Tr. 101). Robinson again called Ulmer and human resources about his concerns. (KR Tr. 106-07). Gathers observed Plaintiffs refusing to work and that Plaintiffs "felt like [Beckley] should approach [them] with direction each day on the job.... [Plaintiffs] would just show up and sit in the car or just sit at the sales desk and watch everyone work." (RG Decl. ¶¶7, 7).

Robinson alleged another employee, Kyle Vasquez, told him and other sales employees that Beckley told other employees Plaintiffs were no longer managers, Plaintiffs were "thugs," and for no one to talk to them. (KR Tr. 65, 76-77; KV Tr. 113-15). Hall also claimed Vasquez told him Beckley said something to the effect of, "Kyle, you shouldn't be hanging out with those 'thugs,'" referring to Plaintiffs. (CH Tr. 78-81). But, Vasquez testified the "thugs" comment was not directed at Plaintiffs specifically, that the group of employees that Beckley allegedly referenced as "thugs" included non-African American employees and Vasquez did not think the comment was race-based. (KV Tr. 103-13). Vasquez also testified he never told Plaintiffs that anyone told him employees should no longer work with Plaintiffs. (KV Tr. 95-96). [3]

---

[3] Robinson posits he learned of this "thug" comment at work on July 21, 2019, but also stated that was his day off. (KR Tr. 64-66). Hall claims he learned about on Friday, July 19, 2019. (CH TR. 78-79). For purposes of summary judgment, we assume it allegedly occurred on Monday, July 22, 2019, the same day Vasquez resigned. (KV Tr. 103).

### e. DAY FIVE: July 23, 2019

#### i. Plaintiffs reported concerns of pay and hostile work environment.

Around 11:00am on July 23, 2019, Hall reached out to Ulmer to get more clarity about his duties and "where we were as far as Mr. Beckley coming in, what we were supposed to do." (CH Tr. 89-91, Ex. 30). Ulmer advised him to speak with Human Resources and provided the appropriate number. (CH Tr. 89-91, Ex. 30).

At 1:04pm, Robinson emailed Ulmer with three complaints: First, he claimed he was told he was demoted, told to sell cars, but never given a new pay plan. (KR Tr. 108, Ex. 9). Robinson later testified this was not true, but he wrote it because he was still unclear about his duties. (KR Tr. 110-13, 142). Second and third, Robinson claimed he was experiencing a racially hostile work environment because of Beckley's so-called MAGA statement and the alleged reference from Vasquez that Beckley referred to Plaintiffs as "thugs." (KR Tr. 116-17, Ex. 9). Ulmer forwarded the complaint to human resources and promptly began to investigate. (DU Tr. 36-71; DU Decl. ¶23).

By 1:48pm that afternoon, Hall texted Ellmer expressing his concerns that he was working without a pay plan and was not going to work around racial jokes, referring to Beckley's co-called MAGA statement and the alleged comment that he and Robinson were "thugs." (CH Tr. 94-103, Ex. 30). Hall forwarded this text to Ulmer. (CH Tr. 102-03; Decl. ¶25).

While Ulmer began investigating, Robinson ran into another employee, Wallah Richardson, who is African American. (KR Tr. 127-30). According to Robinson, Richardson told him he overheard a conversation between Lolli Cornelius and another employee, Bill Anderson, where Lolli allegedly stated Anderson needed to get with the "white side" and join the new management team. (KR Tr. 127-30). At 2:23pm, Robinson emailed Ulmer again to let her know he left work for the day due to what he perceived was a racially-charged work environment based on what he heard from

7

Richardson and because he now felt like he was in danger. (KR Tr. 126-28, 133-34, Ex. 10; Decl. ¶24). Hall testified he personally overheard Cornelius' alleged statement though conflictingly also alleged he heard about it only through Robinson and never included it in his complaint to Ellmer. (*Compare* Compl. ¶27, and CH. Tr. Ex. 37, *with* CH Tr. 138-51, Ex. 30).

ii.   <u>Priority immediately investigated Plaintiffs' concerns.</u>

Consistent with Company policy, Ulmer began her investigation by speaking with Beckley, Cornelius, Richardson, and Anderson. (DU Tr. 36-42; DU Decl. ¶¶26-27). In speaking with Beckley, Ulmer learned Beckley was relaying another's statement when he made the so-called MAGA statement, and he claimed he never made the "thugs" comment. (DU Tr. 59-63, 67-69). Ulmer also learned from talking to Richardson, Cornelius, and Anderson that Cornelius never said "white side." (DU Tr. 91-94). In fact, Richardson himself stated he and other employees were describing the changes Beckley was making at the dealership, and Cornelius said something like, "Trust me, you're on the *right* team." (WR Decl. ¶¶4-5). Richardson, who is African American, later stated, "I felt like Robinson used me." (WR Decl. ¶6).

iii.   <u>Plaintiffs dismissed Priority's efforts and quit.</u>

That afternoon, Ulmer called Robinson in to discuss all of Robinson's complaints and the results of her investigation. (KR Tr. 118-121, 126; DU Decl. ¶28). Ulmer decided to have Beckley present because the results of the investigation revealed most of Robinson's concerns appeared to be miscommunications from Beckley. (DU Tr. 51-52). Also, one of Robinson's chief complaints was Beckley had *not* met with him. (KR Tr. 68-69). While Robinson took issue with the fact that Beckley was in the meeting, he admitted they discussed everything of concern to Robinson. (KR Tr. 119-121).

Beckley also apologized for any poor choice of words he may have made, which Robinson admitted appeared sincere. (KR Tr. 122-24). Beckley presented Robinson with a pay plan for a sales

8

associate, though Robinson would not sign it, stating, "I did not come there to be a salesperson. Never would have done that." (KR Tr. 124-25). Robinson later admitted he would have worked as a sales associate and had accepted a sales associate pay plan just a month earlier with a previous GM. (KR Tr. 136-38, Ex. 6 at 2-4; DU Decl. ¶9). Robinson also admitted he did not care what position he was in, his frustration stemmed from just wanting a direct command from Beckley earlier than Tuesday: "you are fired. You are demoted. This is your new pay plan. Take it or leave it. That didn't happen. Had that happened, we wouldn't be on this [deposition]." (KR Tr. 101-04, 115).

Ulmer attempted to report what she learned about the "white side" allegation (the word used was "right," not "white"), but Robinson dismissed her. (DU Decl. ¶28). Robinson testified "right side" is equally offensive to him because "the underlying portion of the statement is that there was a side, whether it was right or white or left. There was a side. And I was on one side, and they were on the other." (KR Tr. 130-33). "White" or "right," Robinson ironically made a sweeping racial generalization in describing what he perceived to be Cornelius's motive: "I think she's just acting as any other, you know, white American woman would normally act, that this is common for them to do that, to say these things." (KR Tr. 132).

Ultimately Robinson refused to accept the results of Priority's investigation and testified there was nothing Priority could have done differently, as he claims "the only thing that could have been different is … I would have had to have been born white." (KR Tr. 187).

Ulmer also tried to speak with Hall about her investigation, but, after confirming he would return to speak with Beckley, he failed to come back to the dealership and never returned for employment. (DU Tr. 67-70; CH Tr. 101-10, 116-17, 127 Ex. 31). Ulmer later memorialized the findings of her investigation. (DU Tr. 80-85, Ex. 4A; Decl. ¶30).

In his deposition, Robinson accused Beckley of "cleaning up" the dealership by "getting rid of the Black managers." (KR Tr. 204). It is undisputed Beckley had a diverse group of employees, perhaps having upwards of 20 African American employees on his team and employees of color making up 50% of the dealership, many of them managers. No other employees have reported concerns about Beckley having any discriminatory tendencies. (*See generally* RG Decls.; C.Hart Decls.; EC Decls.; LM Decls.; WR Decls.; GM Decl.; MT Decl.; RL Decls.; KG Decls.; KR Tr. 173-74).

### III.   STANDARD OF REVIEW

A court must "grant summary judgment if the movant shows that there is no genuine dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphasis added). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby. Inc*., 477 U.S. 242, 248 (1986). Where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial,'" and summary judgment is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003), *cert. denied*, 541 U.S. 1042 (2004). While a court must view the facts and draw all reasonable inferences in the light most favorable to the non-moving party (generally the plaintiff), "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient;

10

there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## IV. <u>ARGUMENT AND AUTHORITIES</u>

### a. **Plaintiffs' work environment was neither permeated with race discrimination nor was it so intolerable they had no choice but to resign.**

Plaintiffs allege they were forced to resign after experiencing a racially-charged hostile work environment in violation of Title VII, the NCEEPA,[4] and §1981. This combined hostile environment and constructive discharge claim is also known as a "hostile-environment constructive discharge" claim. *Evans v. Int'l Paper Co.*, 936 F.3d 183, 191 (4th Cir. 2019) (citing *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147 (2004)).

To succeed, Plaintiffs must demonstrate (i) they experienced unwelcome harassment; (ii) the harassment was based on their race; (iii) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (iv) there is some basis for imposing liability on Priority. *Evans*, 936 F.3d at 192. And, because Plaintiffs resigned, they must show "something more"—they must show Priority deliberately discriminated against them "to the point where a reasonable person in [their] position would have felt compelled to resign." *Evans*, 936 F.3d at 193 (citing *Green v. Brennan*, 136 S.Ct. 1769, 1777 (2016)). Plaintiffs, therefore, must also prove two additional elements to maintain the constructive discharge aspect of their claim: (v) the deliberateness of Priority's alleged actions, motivated by race bias; and (vi) the objective intolerability of their working conditions. *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 425 (4th Cir. 2014). Plaintiffs fail on all fronts.

---

[4] The NCEEPA does not provide a private right of action, except for wrongful discharge in violation of public policy, and Plaintiffs were not discharged so their claim fails. Smith v. First Union Nat'l Bank, 202 F.3d 234, 247 (4th Cir. 2000). Even if NCEEPA supported a constructive discharge theory, it must fail for the same reason Plaintiffs' Title VII claims fail. *Hughes v. Bedsole*, 48 F.3d 1376, 1383 (4th Cir. 1995).

Plaintiffs failed to present *any* evidence they experienced severe and pervasive conduct *based on* their race, much less, "a calculated effort to pressure [them] into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by [their] co-workers." *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985).

Plaintiffs' concern that Beckley put a spin on former President Trump's MAGA slogan does not in any way implicate race despite Plaintiffs' assertions it is offensive to the African American community at-large. Even assuming Beckley's comment somehow expressed an endorsement of the former President, political preference is not protected under Title VII and this comment neither objectively offensive, nor tied to race. *See Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir. 2003) (noting the "severe or pervasive" element has both subjective and objective components); *see e.g., Carter v. Ball*, 33 F.3d 450, 459-60 (4th Cir. 1994) (holding that having one's supervisor display a poster that may have been offensive to African Americans was insufficient to establish constructive discharge). As to the alleged "thug" comment, Beckley denied referring to Plaintiffs as thugs, and Kyle Vasquez – the sole source of this hearsay allegation – denies it was race based or directed at Plaintiffs. Even assuming Beckley said "thugs," one off-hand comment is not enough to constitute severe and pervasive conduct that would leave an employee with no choice but to resign. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'").

The recording Beckley played for training purposes was selected because the employee was a Sales Manager—not because he was African American. That employee, Gathers, was not offended and it is unlikely any reasonable person would find it offensive. If managers are required to use only white employees as exemplars for training purposes, then the discrimination allegation could swing

12

the other way.  Some flexibility must exist in the workplace for an employer to perform its operations without every act being perceived as racist.  A bad sales call is a bad sales call, regardless of race or ethnicity, and what constitutes a bad sales call is within the employers' own business discretion.  *See DeJarnette v. Corning, Inc.*, 133 F.3d 293, 298-99 (4th Cir. 1998) (noting the court cannot sit as a super-personnel department determining whether the employer's decisions were wise, fair, or even correct, so long as they were non-discriminatory).

Robinson also claims he did not get a handshake on Beckley's first day.  Plaintiffs both claim employees were told not to work with Plaintiffs, and they were not provided a pay plan by the new GM's second morning on the job.  None of these allegations include any evidence that they were based on race, but even assuming these allegations did and are true, the Fourth Circuit held that being ignored by co-workers and top management was insufficient to establish constructive discharge.  *Munday v. Waste Management of North America*, 126 F.3d 239, 244 (4th Cir. 1997).  "Every job has its frustrations, challenges, and disappointments; these inhere to the nature of work," and an employer should not have to face liability every time management fails to shake an employee's hand or refuses to acquiesce to an employee's demands.  *Bristow*, 770 F.2d at 1255.  Whether Beckley made poor management decisions is irrelevant so long as it was not because of Plaintiffs' race.  *DeJarnette*, 133 F.3d at 298-99.

Further, Plaintiffs must prove these things happened *because* they are black—not that these things happened, and they are also black.  *See Holmes v. Bevilacqua*, 794 F.2d 142, 145 (4th Cir. 1986).  Plaintiffs assert nothing more than speculation, positing they know it is based on race because *they know* how white people in general act and *they know* a white man like Beckley would not do these things to another white man, or *they know* it is based on race because "what else could it be based on?" (KR Tr.85, 96-97, 132; CH Tr. 76-77; 80-81).  Even Plaintiffs' inflammatory "white side" allegation,

13

which they still argue is racist now knowing Cornelius said "right side," is likewise unsupported as nothing more than their own conjecture.  (KR Tr. 130-33; CH Tr. 139-40).  Plaintiffs make these accusations despite other African American employees asserting they are not true and having different experiences.  (*See generally* RG Decls.; C.Hart Decls.; EC Decls.; LM Decls.; WR Decls.).  "Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence."  *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).  And because speculation is Plaintiffs' only basis for asserting these things occurred *because of their race*, they fail to present the requisite evidence of deliberateness.

Plaintiffs further fail to demonstrate their working conditions were objectively intolerable.  The fact that Robinson asserts he "c[ouldn't] take it" any more (KR Tr. 101) is not enough. "[T]he law does not permit an employee's subjective perceptions to govern a claim of constructive discharge." *Bristow*, 770 F.2d at 1255.  Plaintiffs' claims that they *felt* like Beckley brought with him a "white team," *felt* that the store was separated by race, and *felt* that employees were not performing deals with them because they were black, do not satisfy their high burden when their own testimony indicates Beckley's alleged "right team" included non-white and African American employees and that non-white employees were conducting deals at the new location, and therefore the store could not have been physically separated by race.  (KR Tr. 79-81; CH Tr.72-74).  While Plaintiffs' impressions may be sincerely held, they are insufficient for summary judgment purposes when contradicted by what the undisputed record shows actually occurred.  *White v. BFI Waste Servs.*, LLC, 375 F.3d 288, 296 (4th Cir. 2004).

Further, there is no basis for imputing liability to Priority.  Priority never dismissed Plaintiffs' concerns.  It is undisputed that Priority promptly investigated and attempted to resolve Plaintiffs'

14

misunderstandings and clarify Beckley's conduct. *Freeman*, 750 F.3d at 424 (noting an employer's obligation to "take prompt remedial action reasonably calculated to end the harassment"). Instead it was Plaintiffs who dismissed Priority's efforts. Even though Robinson admits Beckley was "sincere" in clarifying his conduct, Robinson admits the only thing that would have addressed his concerns is for Robinson to be white. (KR Tr. 187). Hall did not even afford Priority the ability to discuss its investigation as he refused to return. Plaintiffs failed to meet their burden because "[u]nless conditions are beyond ordinary discrimination, a complaining employee is expected to remain on the job while seeking redress." *Evans*, 936 F.3d at 193 (citations omitted). This, Plaintiffs did not do.

In sum, Plaintiffs cannot meet the standard for a hostile work environment claim, much less the heightened standard for a combined hostile-environment constructive discharge claim, and summary judgment should be granted in Priority's favor as to Claims 1, 2, and 8.

### b. Plaintiffs' unlawful demotion and retaliation claims are without merit.

Plaintiffs also allege they were unlawfully demoted because of their race and demoted in retaliation for raising concerns regarding an alleged hostile work environment in violation of Title VII, the NCEEPA, and §1981. To prove discrimination or retaliation under §1981 and Title VII, Plaintiffs must prove (1) direct evidence of discrimination; or (2) through the *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) burden-shifting approach. *See Benson v. Vaughn Indus. LLC*, 450 F. Supp. 3d 655, 663 (E.D.N.C. 2020). For the reasons stated above, Plaintiffs fail to adduce any direct or indirect evidence of discrimination on the basis of ordinary principles of proof. Thus, to proceed under *McDonnell Douglas*, Plaintiffs must establish a prima facie case of race discrimination or retaliation. *Id.* at 665.

To establish a prima facie unlawful demotion claim, Plaintiffs must show (i) they are a member of a protected class; (ii) they were demoted, (iii) they were fulfilling their employer's legitimate

15

expectations at the time of their demotion; and (iv) the demotion occurred under circumstances permitting a reasonable inference of race discrimination. *Id.*

Hall was never demoted before he resigned; he only "felt" like he was demoted, therefore his prima facie claim fails. (CH Tr. 63, 105-13). While he complained he was subject to constant changes in compensation, he admitted he had never had any changes in his compensation when he resigned. (CH. 111-12).

Even assuming Hall's perception is enough, there is no evidence either Plaintiff's demotion occurred under circumstances permitting a reasonable inference of race discrimination. Plaintiffs' only allegation is Priority demoted all the Black managers, but this is false and Plaintiffs admit they left before seeing who Beckley demoted or promoted. (KR Tr. 173-74; CH Tr. 117-18). It is undisputed Beckley terminated only one African American sales manager and the reason was this employee could not get a sales license as required by the state. (DU Decl. ¶33). Beckley likewise terminated a white sales manager for the same thing, and two white sales managers for poor performance. (DU Decl. ¶33). Two other African American sales managers and four other sales managers of color, remained sales managers or were promoted. (DU Decl. ¶33). Plaintiffs' alleged inference is nothing more than false speculation and their claim must fail. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 875 (4th Cir. 1992) (finding unsupported speculation is insufficient to defeat summary judgment).

To establish a prima facie retaliation claim, Plaintiffs must show (i) they engaged in protected activity; (ii) they suffered an adverse employment action at the hands of Priority; and (iii) Priority took the adverse action *because of* the protected activity. *Bryant v. Aiken Reg'l Med. Centers Inc.*, 333 F.3d 536, 543 (4th Cir. 2003). It is undisputed both Plaintiffs resigned, and any allegation they were

16

terminated for engaging in protected activity is false. The only question is whether they were demoted for engaging in protected activity, and the answer is "no."

Hall admits he never experienced any change in pay or position, and therefore cannot claim he suffered any adverse action, or that Priority took any adverse action because of his concerns. (CH Tr. 105-13, 124).

Robinson suffered no adverse action because he ultimately admitted he would not have worked at Priority regardless of position—"not as a sales manager, not as salesperson, not as a janitor." (KR Tr. 137, 164). Robinson also alleges he felt like he and Hall were demoted on Friday—before he even engaged in any alleged protected activity. (KR Tr. 105, 113-17). On Saturday, he learned first-hand from Beckley he may or may not be demoted—Beckley was going to be evaluating everyone moving forward. (KR Tr. 110-11; CH Tr. 123; RG Decls. ¶¶6, 10). This foreshadowing before any protected activity severely undermines Robinson's argument that any demotion was the result of him engaging in protected activity. Finally, Robinson testified that any demotion would not have bothered him, he just wanted clarity. (KR Tr. 101-04, 115).

In sum, Plaintiffs fail to present evidence they were demoted because of their race or because they reported concerns, and summary judgment should again be granted in Priority's favor as to Claims 1, 2, and 8.

### c. Plaintiffs' negligence claim must fail.

Plaintiffs also alleged a litany of negligence claims[5] against Priority with regard to Beckley allegedly being incompetent, but these also fail.

---

[5] Plaintiffs' general negligence claim is not actionable alone but instead appears to be an attempt at replacing Title VII's vicarious liability standard with an additional common law cause of action, and summary judgment should be granted in Priority's favor on Claim 3. *See Vance v. Ball State Univ.*, 570 U.S. 421, 443 (2013). Even if common law negligence was an appropriate claim in this case, which it is not, no conduct occurred that rises to the level of a breach of any duty.

17

To succeed on claims for negligent hiring and negligent supervision/retention, Plaintiffs generally must prove: (i) Beckley was incompetent; (ii) Beckley committed a tortious act; (iii) that injured Plaintiffs; and (iv) prior to the act, Priority knew or had reason to know of Beckley's incompetence. *E.E.O.C. v. TJX Companies, Inc.*, 2009 WL 159741, at \*10 (E.D.N.C. 2009) (citing NC law and the similarity of elements for both claims). Plaintiffs failed to produce evidence on all elements. Plaintiffs' only stated basis is that they believe Priority was negligent because Beckley "should have came in and sat down with the managers and staff, introduced hisself, and told us whether we were going to be there or not and gave us that choice." (CH Tr. 127). While this is Plaintiffs' preferred management process, it is not actionable negligence.

It is undisputed Priority had no indication of prior allegations of harassment or discrimination involving him. (JB Tr. 28-36, 130-32). Plaintiffs fail to create a genuine dispute of material fact as to their negligence claims and summary judgment should be granted in Priority's favor as to Claims 3 and 4.

### d. The conduct Plaintiffs allege is neither extreme nor outrageous and does not support punitive damages.

To succeed on a claim for intentional infliction of emotional distress ("IIED") Plaintiffs must demonstrate (i) extreme and outrageous conduct by Priority, (ii) which is intended to and does in fact cause (iii) severe emotional distress. *Jackson v. TYCO Elecs. Corp.*, 2017 WL 2266851, at \*4 (E.D.N.C. 2017) (citing *Waddle v. Sparks*, 331 N.C. 73, 82 (1992)). "The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it." *Id.* (citing *Waddle*, 331 N.C. at 84). This burden is high. "North Carolina courts have been extremely reluctant to find actionable IIED claims in an employment context. This is true, even in the face of egregious facts." *Roberts v. Glenn Indus. Grp., Inc.*, 2019 WL 356809, at \*4 (W.D.N.C. 2019). Similarly, to receive an award of punitive damages, Plaintiffs must prove Priority intentionally discriminated

18

against them and acted "with malice or with reckless indifference to the[ir] federally protected rights." *EEOC v. Joe's Old Fashioned Bar-B-Que, Inc.*, 2020 WL 3128599, at \*7 (W.D.N.C. 2020) (citing 42 U.S.C. § 1981a). Nothing in the undisputed facts of this case even approaches the high standard necessary to state an IIED claim or to support an award of punitive damages, and they should be dismissed.

### e. Plaintiffs' trespass to chattels/conversion claims are without merit.

Plaintiffs' property claims fail as they failed to demonstrate Priority had either actual or constructive possession of their specific goods in question, and there was an unauthorized taking or dispossession of their property. *See Kirschbaum v. McLaurin Parking Co.*, 188 N.C. App. 782, 787, 656 S.E.2d 683, 686 (2008). Undisputed evidence in the record demonstrates a physical reorganization occurred whereupon dealership property was temporarily moved around and if Plaintiffs had not resigned, perhaps they would have understood this. Moreover, Plaintiffs admitted they did not really look for the goods and the goods had no monetary value, (KR Tr. 175; CH Tr. 135-36, 171-73). Summary judgment should be granted in Priority's favor on Claim 7.

## V.  **CONCLUSION**

For the aforementioned reasons, Priority respectfully requests this Court enter an Order granting summary judgment in its favor and dismissing Plaintiffs' Complaint, with prejudice, and for such other and further relief as the Court deems appropriate.

19

This 25th day of March, 2021.     Respectfully submitted,

*/s Leah M. Stiegler*

King F. Tower (NC Bar No. 31841)
ktower@woodsrogers.com
Pro hac, Michael P. Gardner, Esq. (VSB No. 80380)
mgardner@woodsrogers.com
Pro hac, Leah M. Stiegler, Esq. (VSB No. 89602)
lstiegler@woodsrogers.com
WOODS ROGERS PLC
P.O. Box 14125
10 South Jefferson Street, Suite 1400
Roanoke, Virginia 24038-4125
Telephone:   (540) 983-7600
Facsimile:    (540) 983-7711

*Counsel for Defendant Priority Honda*

20

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that a true copy of **Priority's Memorandum in Support of its Motion for Summary Judgment** was delivered to the Clerk of Court on the date below using the CM/ECF Filing system, and shall deliver a copy of the same to counsel of record addressed as follows:

Alesha S. Brown, Esquire
HALL & DIXON, PLLC
725 East Trade Street, Suite 115
Charlotte, NC 28202
Telephone: 704-935-2656
Facsimile: 704-626-2620
abrown@halldixonlaw.com
Attorney for Plaintiffs

Philip J. Gibbons, Jr., Esquire
Corey M. Stanton
Gibbons Leis, PLLC
14045 Ballantyne Corporate Place
Suite 325
Charlotte, North Carolina 28277
Telephone: (704) 625-2834
phil@gibbonsleis.com
corey@gibbonsleis.com
Attorney for Defendant James Beckley

This the 25th day of March, 2021.

*/s Leah M. Stiegler*

King F. Tower (NC Bar No. 31841)
ktower@woodsrogers.com
Pro hac, Michael P. Gardner, Esq. (VSB No. 80380)
mgardner@woodsrogers.com
Pro hac, Leah M. Stiegler, Esq. (VSB No. 89602)
lstiegler@woodsrogers.com
WOODS ROGERS PLC
P.O. Box 14125
10 South Jefferson Street, Suite 1400
Roanoke, Virginia 24038-4125
Telephone:   (540) 983-7600
Facsimile:   (540) 983-7711

*Counsel for Defendant Priority Honda*

WOODS ROGERS PLC
ATTORNEYS AT LAW